FILED

09 MAR 23 PM 1:50

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

IN the UNited States District Court Middle District of Florida
TAMpa Division

Sidney Ellison, 3/19/09

Plaintiff,

-VS- Case No.: 8:08-CV-419-T-30TGW

John H. Logan,

Defendant.

AFFidavit of Sidney Ellison

State of Florida ]
] SS:
County of Palm Beach ]

BEFORE ME, the undersigned Authority, PERSONALLY APPEARED Sidney Ellison, who ACKNOWLEDGED the FOREGOING AFFidavit, PRESENTED official Florida Department of Corrections INMate Identification and upon being duly SWORN, Stated:

1. I AM A Natural PERSON OVER the AGE OF 18 YEARS AND Make this AFFidavit UNDER OATH.

2. I AM A state PRISONER INCarcerated IN the Southbay Correctional Facility IN Southbay, Florida, A subdivision of the Department of Correction,

After Having been Lawfully Convicted on Charges of Child Abuse and Sentenced To —years Imprisonment.

3. On March 18, 2006, While sitting in My bedroom Talking on My Celular Phone With A Party, Someone knocked on the bedroom door. I Assumed It Was the Police, being aware that My Wife Had Called the Police.

4. I got up and went to the door, Looked out, and seeing that A Deputy With A dog Was in My Living Room, I went back in My bed Room and Continued My Conversation With The Party on The Line.

5. Moments later, Several Sheriff Deputies entered My Home, and My bed Room door Was opened, and Deputy John H. Logan, the Defendant in this Cause of Action, ordered me to get off the Cellular Phone, Lay Face down on the Floor, With both Hands out-stretched above My Head.

6. In Compliance With Deputy Logan's order, I immediately Put down the Cellular Phone and Came back to where Deputy Logan was standing, in My Living Room, Got down on the Floor Face down, both Hands out-stretched above My Head, as ordered, offering no resistance to being Handcuffed by Deputy Logan, or any of the other Deputies who were present in the Living Room.

7. From Where I Stood in the Hallway, in front of Deputy Logan, "Which Was directly in front of the My bed Room door," once I was down on the Floor, My Head and out-stretched arms and Chest area was in the Living Room, and My Waist and Legs Were in The Hall way, which Was only 2½ Feet Long and 2½ Feet wide.

8. Deputy Logan, "From where he stood, in the living room in front of my head and between my out-stretched arms, purposely jumped into the air and came down feet first in my back. He then purposely steped from my back to my buttocks, one foot at a time, before steping to the living room floor.

9. When I screamed out in pain and attempted to roll on my side and draw up my legs in order to protect my person, and attempted to reach back to my back, where it hurt most, one of the deputies present in the room at that time, shouted: Shut up Niggar, and they, as a group, "all of the deputies present in the room," started kicking on and stomping on my hips, thighs, buttocks, and back.

10. After being handcuffed by Deputy Logan, and ordered to get on my feet, I complained about not being able to feel my legs. At that time, I was again addressed as "Nigger" and ordered to shut up. I was then dragged by the deputies out of the house to the deputies crusier and secured in-side.

11. As a proximate result of the actions of Deputy John H. Logan and other law enforcement deputies who assisted Deputy Logan in arresting me, I suffered nerve damage to my sciatica nerve; hip damage; cracked vertebras in my spinal column in my back, and can no-longer walk, stand, or sit comfortably with out severe pain, and has to rely on crutches or a wheel chair, in order to travel for more than a

SHort Distance. I continues to Recieve Medication "NAPROXEN" FOR Pain, But No other Medical Treatment For the Injuries Inflicted upon me by Deputy Logan And other Law Enforcement Deputies of the Pinellas County Sheriff's Department.

12. The Actions of Deputy Logan And other Deputies of the Pinellas Sheriff's Department, Was Wanton And Without Justification.

13. The Defendant's Acts were done Intentionally, In Violation of, or with deliberate or Reckless Indifference to My Constitutional Rights.

14. After My Arrest, On March 18, 2006, And My Arrival At the Pinellas County Jail, I Complained To Medical Staff About Pain In My back. But, because there were No Physical Sign of Scuff Marks or Bruses, It was Determined that Nothing was wrong with me. However, on March 21, 2006, A Follow-up Physical Examination was Conducted, when I Continued to Complain of Back Pain, And A Series of X-Rays were Performed, which showed Advanced degenerative disease of the Lumbar Spine, And that My Lumber Vertebrae Exhibited A Congenital deformity In Conjunction with Scoliosis.

15. On or About March 29, 2006, I was Released From The Pinellas County Jail on bond Pending Trial. On My way Home with My Wife, My Wife Decided to Stop At A Video Store to Purchase Video's. I Got out of the Car to Accompany My Wife In the Store, And

My Legs Gave Away beneath My Body. An Ambulance was Called And I was Taken to The Emergency Room At Northside Hospital, where several Examinations And X-Rays were Taken And Performed of my body. The Attending Physician was Known only by the Name of Doctor (B). Doctor (B) Sent X-Rays of my Injuries over the Internet to Another doctor In Texan, who determined from the Medical Report And X-Rays, that I had Suffered Nerve damage to my Sciatica Nerve, Hip damage, And Cracked Vertebras In my Spinal Column In my back.

16. Subsequent to the Physical Examinations And X-Rays Conducted At Northside Hospital In Saint Petersburg, Florida, my Primary Doctors, Doctor Shastri And Doctor Singh, Referred me to Saint Anthony Medical Center In Saint Petersburg, Florida, where more XRays, A Cat scan An An M.R.I was Conducted on me.

17. Subsequent to being Treated At Saint Anthony's Medical Center In saint Petersburg Florida, I was Referred by my Primary Doctors, Doctor Shastri And Doctor Singh, to The Pain management Center In St. Pete And [Tampa Bay orthopedic], Florida, where I was again Examined, And Pain Medication was Prescribed.

18. I was Then Referred to the Freese Therapy Center In Saint Petersburg, Florida, where I underwent Electro Shock And Heat Treatment And Therapy, And Leg massages.

19. During the month of July, 2006, while out on Bond, I was Re-Arrested on New Criminal Charges.

20. PRIOR TO MY ARREST IN July, 2006, It was my Plan and Intentions to File A Civil Law suit Against The DEFENDANT, JOHN H. Logan, For Damages, And I had REQUESTED All of My Medical Records From My Primary Doctors, Doctor SHASTRI And Doctor Singh, who was/is in Possession of Same. In Response to My Request, the Medical Records were Sent to My Home Address And Recieved by My Wife, who Visited Me At the County Jail, And Informed me that All my belongings From our Home, Had been Packed up And Either destroyed, or donated to Charity, Encluding the Medical Records From My Primary Doctors. However,

21. On or About March 2, 2009, I was Able To get in Contact with My Primary Doctor, Doctor SHASTRI, Who INFORMED me That She did Not Know the where Abouts of Doctor Singh, And that she belieyed He had Resigned From the Practice of Medicine. Doctor SHASTRI Advised me to write to Her And She would Send me All the Medical Records She Has on File Pertaining to This Matter, At my Expense. I Am Now Waiting To Receive The Promised Medical Records From Doctor SHASTRI

22. IN His Motion for Summary Judgment DEFENDANT Logan Alleges that The Records Filed In this Cause of Action, does Not Contain Any basis to Conclude that He Caused Any Injury To Plaintiff Ellison.

23. Contrary to the Above, SEE Affidavit of DEFENDANT Logan, which was Filed In This Court on February 27, 2009, Paragraph (7) Through Paragraph 12, Attached. The Record reveal that

DEFENDant Logan Stated that HE ORdERED Plaintiff Ellison To Come out OF THE bed-Room And Lay down ON the Hallway Floor SEVERal Times, BEFORE Plaintiff Ellison RESPONdED IN ANy Fashion, And that when Plaintiff Ellison did RESPOND, HE did Not Follow His directions To ComE Into THE Hallway And Lay down.

25. DEFENDant Logan Stated that Plaintiff Ellison Layed down ON His Stomach, With His HEad And SHoulders sticking out Into the Hall, FRom THE doorway OF THE bEdROOM, And His CHEST And Abdomen WERE IN THE doorway Itself, And THE REST OF His body REmained out OF DEFENdant Logans REach IN THE BEdROOM.

26. DEFENDant Logan Stated that It was Clear To Him That Long As Plaintiff Ellison REmained PRONE IN THE bEdRoom doorway, HE, DEFENdant Logan, would bE unable To maintain AN Advantageous position to React to Any unExpected movements by Plaintiff Ellison.

27. DEFENDant Logan Stated that IN AN Effort To make THE situation Safer, by Allowing Him To get behind Plaintiff Ellison while Hand-Cuffing Him, HE, DEFENDant Logan, Again gave Plaintiff Ellison SEVERal Commands to move forward Into The Hallway, but That Plaintiff Ellison REFUSEd to budge And Stayed ON THE Floor IN THE Doorway.

28. DEFENDANT Logan Stated that as long as Plaintiff Ellison Remained in that Position and Location, It would be Physically Impossible For Defendant to Stand or Kneel near Plaintiff's Head in the Hall-way, balance Defendant's self while Leaning across Plaintiff's torso, Holding Plaintiff's Arms in Place and secure the Hand-Cuffs on Plaintiff's wrists. Additionally, Defendant Logan Stated that if he Had tried to do so, He, the Defendant, would have made Himself Extremely Vulnerable to any attack by Plaintiff Ellison. There-fore, He, Defendant Logan, decided to enter the bedroom, in order to get be-hind Plaintiff Ellison, which based on His, Defendant Logans Training and Experience, Provides the most control to the arresting officer, while decreasing the risk of Injury.

29. DEFENDANT Logan stated that in order to get into the bedroom, He had to step from where He stood near Ellison's Head, all the way through the Doorway and onto the Bedroom Floor near Plaintiff Ellison's thighs.

30. DEFENDANT Logan Stated that the Top of the doorframe was too low for Him to Jump over Plaintiff Ellison, so He, Defendant Logan, Placed one Hand on each side of the door-frame and Gripped tightly, to lift Himself upward, and while supporting His weight using the door-frame, He Placed His Lead Foot briefly on Plaintiff Ellison's Buttocks For Balance, and

then swung His other Foot over Plaintiff's Body.

31. Defendant Logan Stated that once He was in the bedroom, Plaintiff Ellison Continued to Refuse His Commands and would not willingly Put His Hands/Arms behind His back. Defendant Logan Stated Further that He Had to Forcibly bring Plaintiff's Arms behind His back to Handcuff Him Properly and Safely. Defendant Logan Stated Further that He did not use any other Force on Plaintiff once He was Secured in Handcuffs, and that Plaintiff Ellison did not appear to be in Pain or distress, as He, Defendant Logan, took Him to His official Vehicle, to Transport Him to the Pinellas County Jail. Defendant Logan Stated that He did not Jump on Plaintiff's Back or Kick Plaintiff, and that no one else did, From the Time He, Defendant Logan, Entered the Residence, until He, Defendant Logan delivered Plaintiff Ellison to booking Area of the Jail. However,

32. See Deposition of Defendant, John Logan, Filed in the Circuit Court For Pinellas County, Florida Circuit Criminal No. CRC06-05863CFANO-D, on December 29, 2006. The Record Reveal that Defendant Logan testified on deposition on November 16, 2006, [Page (5) Line (10) Through Page (7) Line (17)], that Deputy Elrod went in and Located the Plaintiff in the bedroom; that the Plaintiff was Just sitting on a Chair talking

ON His CEll Phone And wouldn't RESpond To Deputy Elrod's Commands to Come out of the bedroom. HE TESTIFIED that EVENtually, Plaintiff got up ON His own And Just walked IN the Hallway And Stood there, then Finally got down on the Floor. HE testified that Plaintiff Slede back down IN between the door So there was Really A tight Squeeze.

33. DEFENdant Logan Testified ON deposition ON November 16, 2006, That HE tried to Leap OVER The Plaintiff Sidney Ellison So HE Could Properly Handcuff Plaintiff Ellison, And that HE Just Stepped ON Plaintiff Ellison's Buttocks Area to get over Him, So that HE Could get behind Plaintiff Ellison, To Properly do A Safe Handcuffing. HE TESTIFIED that HE Had to get over the Plaintiff to get behind Him, And there was Just No Room For Him to get Around Plaintiff to Get behind Him, So HE Just Hopped OVER Him.

34. Contrary to All of the Above, SEE Plaintiff's Blue-Print of the Sene of Arrest.



35. The Hallway Defendant Logan, Speaks of Immediately In Front of Plaintiff's Bedroom door Is only 2½ feet wide, And 2½ feet Long, From The Bathroom door To the Living Room Enterance, where Deputy Logan was standing In Front of Plaintiff Ellison. Fact is, there is only Enough Room In The Tiny Hallway, For one Person To stand At A Time.

36. When Plaintiff was ordered to come out of the bed-Room And Lay down on the Floor, with both hands extended Above His head, Plaintiff Simply opened the door And Steped out in the Tiny Hallway, turned to face Deputy Logan, Layed down on His Stomach Face down, With both Hands Extended Above Plaintiff's Head. One Plaintiff was down on the Floor With Hand Ex-tended, Plaintiff's Hands, Head, Chest Area down To His waist, was out In the Living Room, And His Legs was In The Tiny 2½ Feet by 2½ Feet Hallway. At No time did Plaintiff Slide back into the bedroom or Resist Deputy Logans Efforts to HandCuff Plaintiff.

37. Further more, there was Plenty of Room In The Tiny 2½ Feet Hallway For Deputy Logan to Place His Feet on the Floor of the Hallway beside the Plaintiff, In order to Get down behind the Plaintiff to Properly HandCuff the Plaintiff. Furthermore, From where Deputy Logan Stood In The Living Room, He Could Have ordered the Plaintiff to Roll over on Plaintiff's back, Sit up on the Hallway Floor, Facing The Bathroom door, With Plaintiff's Hands behind His Back, And Safely And Properly Accomplish The Task without Incident, or without Jumping upon Plaintiff's back or even steping on Plaintiff.

38. DEFENDANT, JOHN H. LOGAN, ALLEGES IN HIS MOTION FOR SUMMARY JUDGMENT THAT AS A GOVERNMENT ACTOR, HE IS ENTITLED TO THE PROTECTION OF QUALIFIED IMMUNITY.

39. SEE HAFER V. MELO, 112 S. CT. 358, 116 L.Ed. 2d 301 1991. PUBLIC OFFICIALS DO NOT AUTOMATICALLY HAVE IMMUNITY FROM SUIT WHEN THEY ARE SUED IN THEIR INDIVIDUAL CAPACITIES.

40. SEE LANGLEY V. ADAMS COUNTY, 987 F.2d 1473, 1477 (10th CIR. 1992). OFFIC . SUED IN THEIR OFFICIAL CAPACITIES CANNOT RAISE QUALIFIED IMMUNITY.

41. SEE BARBER V. CITY OF SALMON, 953 F.2d 232, 237 6th CIR. 1992. IN FILING A SECTION 1983 LAWSUIT AGAINST GOVERNMENT OFFICIALS IN THEIR OFFICIAL CAPACITIES, THESE INDIVIDUALS MAY BE HELD LIABLE SINCE THEY ARE CONSIDERED ENTITIES THEMSELVES.

FURTHER AFFIANT SAYETH NOT.

# [signature] #649853

SIDNEY ELLISON #649853

SWORN TO AND SUBSCRIBED BEFORE ME ON MARCH 19th, 2009, BY SIDNEY ELLISON WHO ACKNOWLEDGED THE FOREGOING AFFIDAVIT, PRESENTED OFFICIAL FLORIDA DEPARTMENT OF CORRECTIONS INMATE IDENTIFICATION AS IDENTIFICATION AND DID TAKE AN OATH.

NOTARY PUBLIC STATE OF FLORIDA
LILIAN NZURIKE
MY COMMISSION # DD 794672
EXPIRES: June 4, 2012
Bonded Thru Budget Notary Services

# [signature]

NOTARY PUBLIC

MY COMMISSION EXPIRES

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that ON MARCH __, 2009, A Copy OF THE FOREGOING AFFIDAVIT OF SIDNEY ELLISON, Was FILED WITH THE CLERK OF COURT. I FURTHER CERTIFY that I MAILED THE FOREGOING document by UNITED STATES MAIL to SHERWOOD S. COLEMAN, FLORIDA BAR NO. 0022632, PINELLAS COUNTY SHERIFF'S OFFICE, 10750 ULMERTON Road, LARGO, FLORIDA 33778.

3/19/09

# Sidney J. [signature] #649853

SIDNEY ELLISON #649853